Matter of Anthony S. (2025 NY Slip Op 50656(U))

[*1]

Matter of Anthony S.

2025 NY Slip Op 50656(U)

Decided on March 26, 2025

Surrogate's Court, Suffolk County

Messina, Jr., S.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 26, 2025
Surrogate's Court, Suffolk County

In the Matter of the Guardianship of Anthony S., Pursuant to SCPA 17-A.

File No. XXXXX

Andrew M. Cohen, Esq.
Attorney for Petitioner
1100 Franklin Avenue, Suite 305
Garden City, NY 11530
Sandy Pendrick, Esq.
Attorney for Objectant
90 Merrick Avenue, 9th Floor
East Meadow, NY 11554
Cameron Catrambone, Esq. 
Mental Hygiene Legal Service
320 Carleton Avenue, Suite 3200
Central Islip, NY 11722

Vincent J. Messina, Jr., S.

By decree of this court dated December 7, 2018, Anthony S., the above captioned respondent, was determined to be a person with a developmental disability and Ms. M., respondent's mother (hereinafter objectant), was appointed as guardian of his person pursuant to SCPA 17-A. Mr. A., respondent's father (hereinafter petitioner), was appointed the standby guardian. Without opposition, the court also appointed second and third alternate standby guardians.
By this proceeding, petitioner now seeks to remove objectant as the guardian of the person and to appoint him as successor guardian. He also requests that Lori and Ralph, Respondent's stepmother and stepfather, respectively be appointed successor standby guardians. In addition, he asks that Amanda, respondent's sister be appointed the first alternate standby guardian. 
Jurisdiction has been obtained over all persons listed in the petition as necessary parties, including the ward. Mental Hygiene Legal Services was appointed to represent Anthony's interests. A trial was held pursuant to SCPA 1754 on August 26 and 27, 2024. At the conclusion of the trial, the court reserved decision and allowed the parties to submit post-trial memorandum of law. In lieu of filing the memorandum of law, the attorneys requested the trial transcript, which was submitted through the Sharepoint system in January 2025, be filed with the court as part of the record. 
The parties concur that Anthony requires a SCPA 17-A guardianship and agreed on a statement of issues that was placed on the record. Essentially, the issue before this court is whether it is in Anthony's best interest to modify the December 7, 2018 decree to remove the objectant-mother as the guardian and to appoint the petitioner-father as his sole guardian. 
The record reflects that Anthony is 25 years old and has lived at Young Adult Institute (YAI) residential facility since July 2020 when he was 20 years old. Medical records indicate that Anthony has been diagnosed with autism spectrum disorder. 
Trial
Three witnesses testified at the trial in the following order: petitioner-father, Danielle S., YAI Director, and objectant-mother. In addition, 4 exhibits, including YAI subpoenaed records containing behavioral data were marked and moved into evidence on consent. Mental Hygiene Legal Service stated on the record that they take no position with regards to the relief requested in the petition. 

Petitioner's Testimony
Petitioner claims that based upon his research and conversations with YAI staff, objectant lacks understanding and appreciation of the role of a guardian, especially when it comes to Anthony's medications regimen. He believes this lack of understanding has a negative impact on Anthony's quality of life. 
Up until a few years ago, just prior to petitioner filing the instant petition, he had unfettered access to the YAI staff, mainly Ms. S., who would communicate with him about how Anthony was doing at YAI whenever he would ask. While petitioner was aware that YAI regularly records Anthony's behaviors and compile them into a data report, he never requested to see it. However, petitioner testified that he had reviewed with his attorney the behavioral data generated by YAI that documented hundreds, sometime thousands of inappropriate behaviors by Anthony, such as inappropriate touching, self-injurious action, verbal and physical aggression and property damage. By ignoring the data, he believes objectant is not making medical decision in Anthony's best interest. 
Petitioner testified that objectant does not allow the medications to reach a therapeutic level to be effective in toning down these behaviors, as he noticed that Anthony's behaviors, which petitioner describes as excessive, remain largely unchanged. According to petitioner, objectant would often inform him that Anthony is starting new medications or having his dosages reduced. He asserts that by minimizing the importance of the data and preventing the medications from reaching a therapeutic level by frequently changing them, objectant's decision in regard to Anthony's medical care is compromised and ultimately negatively impacted his quality of life. 
Petitioner testified that while he recognized that he is not a doctor or that "you can't be a doctor off Google," he knows that the medications did not reach the therapeutic level noting the unchanged behavior and the frequent change in medications. In his testimony, petitioner indicated that he is not certain whether the behaviors documented by YAI are even related to the medications themselves or the increase in dosage. When asked "what is driving [his] belief that [Anthony] is not properly medicated?" petitioner's answer was that he had once heard from an aide at Anthony's school who said that there are medications that had "done wonders" for those kids who have "worse behaviors than Anthony." He further stated that he believes the insights or opinion of an aide with her years of experience, just like YAI staff, should hold more weight than the assessment a newly graduated medical doctor. When questioned what and how many medications Anthony had taken and what side effects they had on him, petitioner was unable to [*2]provide specific answers. 

Objectant's Testimony
In contrast, objectant provided detailed testimony regarding Anthony's medical history. She identified all of his various doctors and described in detail the antipsychotic medications Anthony had taken starting in his teenage years and the effects they have had on him. Objectant testified that Anthony has tried numerous options of antipsychotic medicines at both increased and decreased dosages, many of which caused him constipation or led to more severe side effects. For example, when Anthony was given Seroquel, he started to injure himself by punching himself in the head. Another medication, Geodon, caused Anthony to be physically aggressive. She remembered that the school administration called her stating that "[y]ou have to leave work; [h]e's about to explode — [i]t's bad." 
As a result of these incidents, Anthony's doctor ordered a genetic test, analyzing one's genetic makeup to assess how their body may respond to specific medications. Based upon the test, Seroquel was prescribed.Again, Anthony had an adverse reaction to the medication. The school administration once again had to summon objectant because he was angry and throwing things out of the closet. According to objectant, the doctor who ordered the genetic test explained that there are some autistic children who cannot tolerate certain medicines in the antipsychotic class. Due to its inaccuracy and the fact that YAI staff did not request it, objectant did not find it important to share the result.
In light of the aggression caused by the various medications, Anthony went back to taking Prozac even though it caused him constipation. In an effort to relieve him from his constipation, his doctor once again adjusted his medication. This time he was prescribed Zoloft, which Anthony took from the age of 20 to 23 without any issue. After he moved into YAI, the staff there told objectant that they would like to make a change to his medications because Zoloft "wasn't doing too much." Wanting to have a fresh start for Anthony, objectant consulted with Dr. Somerville, his psychiatrist, who recommended Tenex for Anthony. Dr. B., Anthony's treating physician while at YAI, agreed with the recommendation and prescribed two milligrams of Tenex. Unfortunately, after a few months of taking the Tenex, Anthony suffered severed constipation that he had to be taken home to his mother's house where it took her "two days to clear him out." In addition, he lost his appetite, and his weight went down 10 pounds in two weeks. After he returned to YAI, objectant requested that the dosage for Tenex be reduced to one milligram and that he sees a gastroenterologist who issued a standing prescription for MiraLAX.
Objectant testified that she follows Anthony's doctors' recommendations and is not opposed to Anthony taking medications. In fact, in a recent meeting, prior to the trial, with Dr. M. who took over after Dr. B. retired, she agreed to the doctor prescribing Anthony a new medication Dapakote and she believes it is helping Anthony. She testified that her decision with respect to Anthony's medications and dosages is based upon balancing the effectiveness of the medications against the side effects and the impacts on Anthony's overall well-being.
According to objectant, Anthony's overall well-being had always been her paramount concern throughout Anthony's childhood. She stated that she first noticed that Anthony was developmentally delayed when he was around 2 years old and immediately sought medical advice. She enrolled him in early intervention programs after seeing that he was not meeting his milestones. At the suggestion of Anthony's speech therapist, objectant brought him to a neurologist when he was 3 and 1/2 years old. The neurologist diagnosed Anthony with PPD-NOS (Pervasive Developmental Disorder — Not Otherwise Specified). After the diagnosis, [*3]objectant spent countless hours researching additional services, coordinating therapies and investigating the best possible treatment for Anthony. She testified that petitioner was never involved in Anthony's therapy nor communicated with the therapists. She further testified that she applied for IEP when it came time for Anthony to start public school and obtained services for him after numerous meetings with the teachers, service providers, and the school district, all without petitioner's help.

Contact with Anthony
In 2004, the parties were already separated and petitioner living in Connecticut. Despite a visitation schedule that included every other weekend and Wednesdays, plus a week each during the winter and summer breaks, objectant claimed that petitioner did not exercise his visitation to the fullest extent. After the parties' daughter attended college, petitioner only visited Anthony every other Wednesday with no overnights. 
Petitioner testified that he had avoided overnight visits given his concern about Anthony's episodes of losing control, which he feels were not adequately addressed, particularly when there were young children at petitioner's household at the time. Once Anthony moved into YAI, the visits became monthly day trips. Petitioner testified that had had visited his son's group home several times, pointing out that the mother never even entered Anthony's group home. 
Objectant, on the other hand, testified that her husband would pick up Anthony every other weekend, often for overnight stays at her house. Anthony would go to objectant's house every other weekend with some weekends being overnights. She also has constant contact with the staff at Anthony's group home, particularly Adam. Adam is the supervisor at his group home who is primarily responsible for Anthony's day to day care. She speaks to Adam at least three times a week who tells her that Anthony is doing well and reported no major concerns over his behaviors. Unlike petitioner, objectant testified that she does not find the behavior data to be particularly important because the behaviors noted are typical of someone like Anthony with developmental disability. She further states that if these behaviors were truly problematic, Adam would have told her during any of the weekly updates, or at the very least she would have been notified or consulted immediately. She regularly receives the life plan reports summarizing Anthony's care and needs and attends life plan meetings with his care managers and healthcare providers.

Ms. S.'s Testimony
Petitioner called Ms. S. as a witness. Ms. S. is the residential director of Anthony's home as well as 3 other YAI facilities. She visits Anthony's group home at least once a week based on the program's needs at his group home. She explains that each of the YAI facilities has a supervisor. As a director she oversees the staff, has meetings with supervisors, meets with the residents, reviews medical appointments, addresses maintenance issues and fulfills other supervisory duties. 
She testified that her staff records the behaviors of the residents at YAI and at the end of each month, categorizes and tallies the daily behaviors into a behavior data report. The report documents various behavior categories, such as inappropriate touching, verbal aggression, self-injury, physical aggression, property destruction, spitting and unsafe window usage. Ms. S. described each of these categories. Inappropriate touching, she testified, is poking, tapping people, pulling at their legs, shirts and the like. Verbal aggression consists of screaming, cursing or making threats. Self-injurious behavior involves hitting and kicking of self, pinching own skin, pulling on hair, arms or legs. Physical aggression consists of hitting, kicking, pinching and scratching others. Ms. S. further stated that spitting means spitting on the bed, spitting on [*4]documents, chairs or tables. Property damage means throwing items, breaking items and peeling paint off the wall. Lastly, unsafe window usage involves throwing things or urinating out the window. 
Ms. S. testified that YAI staff do not call the family every time a resident has a "behavior" issue. However, "if there [was] a significant incident that happen[ed], [YAI] do inform the families," such as urinating out the window where a guardian's consent would be required in order to modify the window and implement necessary safety measures. Generally, the behaviors are documented to track trends — whether there's an increase, decrease or no change in an individual's behaviors. The data is shared with the treating psychiatrist to assist them in "mak[ing] a decision on what they want to do with medication." She as the director does not make decisions on medication adjustment or treatment plans as she does not have any medical training. She testified that the ultimate decision on what medication an individual should be prescribed is made by the psychiatrist.

Applicable Law
Under SCPA 1755 the court may modify a prior guardianship order if the "interest of justice will be best served" based upon a showing that such modification is necessary in "protecting the personal and/or financial interests of the person" under a disability pursuant to SCPA 17-A. The determination of what is in the ward's best interests rests within the sound discretion of the Surrogate's Court (Matter of Garett YY, 258 AD2d 702). In determining best interests, the court takes into consideration the emotional needs of the incapacitated person, his physical and intellectual needs and the limitations imposed upon him as a result of his disability (Matter of J.N., 58 Misc 3d 1204[A]; In re Guardianship of Burns, 42 Misc 3d 1209). In determining the best interests in cases involving the selection between two parents, the court finds it appropriate to consider those factors analogous in child custody proceedings. Such factors include (1) the child's desires, (2) the relative fitness of the parents, (3) the parents' financial status, (4) the original placement of the child, (5) the length of that placement, (6) the parental guidance given to the child, and (7) the parents' ability to provide for the child's emotional and intellectual development (Gottfried v. Gottfried, 163 AD3d 966, 966-967). Petitioner bears the burden of proving that the current SCPA 17-A guardianship is not in the ward's best interests (SCPA 1750-A; Matter of Maselli, NYLJ, March 29, 2000 at 28, col. 4; Matter of Michael J.N., supra).

Discussion
The testimony of the parties establishes that both parties love their son and want what is best for him. Both parties agree that objectant had undertaken the task of researching and was solely responsible for identifying and procuring suitable services for Anthony after learning of his disability when he was around two years old. The parties are also in agreement that Anthony is receiving appropriate care at YAI. Where they disagree is the suitability of the objectant serving as the guardian. 
Applying the factors above, the court finds that objectant is the more suitable guardian to provide for Anthony's physical, emotional and intellectual development. 
Objectant has been the one constant in Anthony's life. She actively participated in his therapy sessions, took him to afterschool programs and attended his doctor appointments. She was deeply involved in the process of applying for his IEP and worked diligently to secure the necessary services to support his needs. In fact, the petitioner admitted that objectant had been the one who took charge of all the research and handled the legwork from obtaining services to finding suitable group home for Anthony. Petitioner lived with her son until he moved into YAI [*5]at the age of 20. Even after his move, she maintained regular visits, seeing him every other weekend, with many weekends including overnight stays. 
Throughout Anthony's upbringing, objectant has demonstrated a comprehensive understanding of his needs and consistent management of his care. Objectant provided detailed information about his medications and their effects on him, citing specific instances of adverse reactions that led to adjustments based upon his doctor's recommendations.
In contrast, petitioner's lack of detailed knowledge about the various medications his son had taken and their side effects, reflects a limited understanding of his medical care and treatment needs. His claim that objectant prevented the medications from reaching a therapeutic level is speculative and unsupported by the record. It is based on his observation that the medications were not administered long-term and his allegations that objectant frequently altered them without justification. 
Petitioner's argument lacks evidence and corroboration from medical professionals. Although Ms. S. suggested that the medications had not reached a therapeutic level, she admitted to having no medical training and deferred ultimate treatment decisions to the psychiatrist. Her testimony, which relies on hearsay from the psychiatrist, provides no proof of the petitioner's assertion. Further, it lacks critical context, such as the specific timeframe, the medications in question, and the duration for which a particular medication has been administered. Her statement is not evidence that objectant prevented the medications from reaching a therapeutic level.
Petitioner's own testimony weakens his position. He admitted that his son is receiving proper care at the facility. Petitioner testified that he has no concerns regarding the professionalism of the doctors overseeing his son's care and does not dispute the treatment plan or prescribed medications. These acknowledgments contradict his claim about the medications not being at therapeutic levels. They also undermine his argument that objectant is making poor medical decisions and is unfit to continue to serve as the guardian. 
As the primary caretaker, objectant has been providing for Anthony's physical, emotional and intellectual development. It is reasonable for objectant to exercise caution regarding the medications prescribed to her son, given his history of adverse reaction and the aggressive behavior he has exhibited in response to certain medications. Petitioner fails to establish that objectant is disregarding Anthony's doctors' advice in her approach to managing his treatment. The evidence shows that objectant has diligently tried various medications through a process of trial and error, guided by his doctors' recommendations to find the most effective treatment for him while employing a holistic approach to address his needs. Objectant's action of not sharing the genetic testing result is not determinative, considering the experience she had with the medications in the past. It also does not appear that the genetic testing was crucial to Anthony's treatment as the facility did not request it.Furthermore, the fact that objectant never physically entered Anthony's group home, while petitioner has, in no way negates the fact that she has been the constant source of support, and a consistent presence in his life.
Based upon the foregoing, the court finds that petitioner has not met his burden in demonstrating that modifying the December 7, 2018 decree, which appointed objectant as the guardian of the person of Anthony, would be in the ward's best interest. In light of the court's decision, petitioner's request for the appointment of successor standbys is also denied. 
Accordingly, it is
ORDERED, that the relief requested by petitioner is denied in its entirety; and it is further
ORDERED, that the decree dated December 7, 2018 shall remain in full force and effect.